UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHUN YAO CHANG, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>CUSTOMERS BANCORP, INC., JAY S. SIDHU, and CARLA A. LEIBOLD,<br><br>     Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Chun Yao Chang ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Customers Bancorp, Inc. ("Customers Bancorp" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**<u>NATURE OF THE ACTION</u>**

1.    This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Customers Bancorp securities between March 1, 2024 and August 8, 2024, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by

Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act")

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Customers Bancorp securities during the Class Period and was economically damaged thereby.

7.      Defendant Customers Bancorp is a bank holding company. It describes itself as follows:

> Customers Bancorp is a bank holding company engaged in banking activities through its wholly owned subsidiary, Customers Bank, collectively referred to as "Customers" herein. Customers is a forward-thinking bank with strong risk management that provides commercial and consumer customers the stability and trust inherent in working with an

established and regulated financial institution. The Bank has diversified lending activities that build overall franchise value and a high-tech, high-touch branch-light strategy that serves its customers through a single-point-of-contact private banking strategy with a focus on community banking businesses, including commercial and industrial and commercial real estate loans (to borrowers in Pennsylvania, New Jersey, New York City, New England and other geographies), multifamily lending, SBA lending and residential mortgage lending. The Bank also serves specialty businesses nationwide, including its specialty lending, commercial loans to mortgage companies and commercial equipment financing. The Bank offers digital banking to commercial and consumer businesses nationwide, including Banking-as-a-Service to fintech companies, payments and treasury services to businesses, and consumer loans through relationships with fintech companies.

8.      Pertinent to this action is the Company's digital asset business, which the Company describes as follows:

In 2021, Customers Bank launched [CBIT] on the [TassatPay] blockchain-based instant B2B payments platform, which serves a growing array of B2B clients who want the benefit of instant payments, including key over-the-counter desks, exchanges, liquidity providers, market makers, funds, and other B2B verticals. CBIT may only be created by, transferred to and redeemed by commercial customers of Customers Bank on the instant B2B payments platform by maintaining U.S. dollars in deposit accounts at Customers Bank. CBIT is not listed or traded on any digital currency exchange. As of December 31, 2023 and 2022, Customers Bank held $2.8 billion and $2.3 billion of deposits from customers participating in CBIT, respectively. The CBIT instant payments platform provides a closed-system for intrabank commercial transactions and is not intended to be a trading platform for tokens or digital assets. CBIT tokens are used only in connection with the CBIT instant payments platform and are not securities for purposes of applicable securities laws. There are no scenarios in which the transaction or redemption value of one CBIT would not be equal to one U.S. dollar. Each CBIT is minted with precisely one U.S. dollar equivalent, and those dollars are held in a non-interest bearing omnibus deposit account until the CBIT is burned or redeemed. The number of CBIT outstanding in the CBIT instant payments platform is always equal to the U.S. dollars held in the omnibus deposit account at Customers Bank and is reported as a deposit liability on the consolidated balance sheet. The deposits from customers participating in CBIT include the omnibus deposit account established for the CBIT instant payments platform, which had an outstanding balance of $826.9 million and $23 thousand at December 31, 2023 and 2022, respectively.

9.      Customers Bancorp is incorporated in Pennsylvania and its head office is located at 701 Reading Avenue, West Reading, Pennsylvania 19611. Customers Bancorp's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "CUBI."

10.     Defendant Jay S. Sidhu ("Sidhu") served as the Company's Chief Executive Officer ("CEO") throughout the Class Period. Additionally, he serves as the Chairman of the Company's Board of Directors (the "Board").

11.     Defendant Carla A. Leibold ("Leibold") served as the Company's Chief Financial Officer ("CFO") until April 10, 2024.

12.     Defendants Sidhu and Leibold are collectively referred to herein as the "Individual Defendants."

13.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.    Customers Bancorp is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.    Customers Bancorp and the Individual Defendants are collectively referred to herein as "Defendants."

### SUBSTANTIVE ALLEGATIONS

**Materially False and Misleading Statements
Issued During the Class Period**

17.    On February 29, 2024, after market hours, Customers Bancorp filed with the SEC its annual report on Form 10-K for the year ending December 31, 2023 (the "2023 Annual Report"). Attached to the 2023 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Sidhu and Leibold attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

18.    The 2023 Annual Report contained the following statement regarding the Company's disclosure controls and procedures:

> Customers Bancorp maintains disclosure controls and procedures designed to ensure that information required to be disclosed in its periodic filings under the Exchange Act, including this Annual Report on Form 10-K, is recorded, processed, summarized and reported on a timely basis. ***These disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed under the Exchange Act is accumulated and communicated to its management on a timely basis to allow decisions regarding required disclosure***. Customers Bancorp carried out an evaluation, under the supervision and with the participation of Customers Bancorp's management, including Customers Bancorp's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Customers Bancorp's disclosure

controls and procedures as defined in the Exchange Act Rules 13a-15(e) and 15d-15(e) as of December 31, 2023. ***Based upon that evaluation, Customers Bancorp's management concluded that its disclosure controls and procedures are effective as of December 31, 2023.***

(Emphasis added).

19.     The statement in ¶ 18 was materially false and misleading at the time it was made because, upon information and belief, the Company had "significant deficiencies" relating to compliance with Anti-Money Laundering ("AML")-focused statutes, rules, and regulations, including the Bank Secrecy Act.

20.     The 2023 Annual Report contained the following statement on Management's Annual Report on Internal Control over Financial Reporting:

 Under the supervision and with the participation of management, including Customers Bancorp's Chief Executive Officer and Chief Financial Officer, Customers Bancorp's management assessed the effectiveness of Customers Bancorp's internal control over financial reporting as of December 31, 2023. In making that assessment, management used the criteria set forth in the framework in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based upon that evaluation, Customers Bancorp's management concluded that its internal control over financial reporting was effective as of December 31, 2023***.

(Emphasis added).

21.     The statement in ¶ 20 was materially false and misleading at the time it was made because, upon information and belief, the Company had "significant deficiencies" relating to compliance with AML-focused statutes, rules, and regulations, including the Bank Secrecy Act.

22.     The 2023 Annual Report contained the following statement regarding legal compliance:

***We are subject to numerous laws and governmental regulations and to regular examinations by our regulators of our business and compliance with laws and regulations, and our failure to comply with such laws and regulations or to adequately address any matters identified during our examinations could materially and adversely affect us.***

Federal banking agencies regularly conduct comprehensive examinations of our business, including our compliance with applicable laws, regulations and policies. Examination reports and ratings (which often are not publicly available) and other aspects of this supervisory framework can materially impact the conduct, organic and acquisition growth and profitability of our business. Our regulators have extensive discretion in their supervisory and enforcement activities and may impose a variety of remedial actions, conditions or limitations on our business operations if, as a result of an examination, they determined that our financial condition, capital resources, asset quality, earnings prospects, management, liquidity or other aspects of any of our operations had become unsatisfactory, or that we or our management were in violation of any law, regulation or policy. Examples of those actions, conditions or limitations include enjoining "unsafe or unsound" practices, requiring affirmative actions to correct any conditions resulting from any asserted violation of law, issuing administrative orders that can be judicially enforced, directing increases in our capital, assessing civil monetary penalties against our officers or directors, removing officers and directors and, if a conclusion was reached that the offending conditions cannot be corrected, or there is an imminent risk of loss to depositors, terminating our deposit insurance. Other actions, formal or informal, that may be imposed could restrict our growth, including regulatory denials to expand branches, relocate, add subsidiaries and affiliates, expand into new financial activities or merge with or purchase other financial institutions. The timing of these examinations, including the timing of the resolution of any issues identified by our regulators in the examinations and the final determination by them with respect to the imposition of any remedial actions, conditions or limitations on our business operations, is generally not within our control. We also could suffer reputational harm in the event of any perceived or actual noncompliance with certain laws and regulations. If we become subject to such regulatory actions, we could be materially and adversely affected.

23.    The statement in ¶ 22 was materially false and misleading at the time it was made because, upon information and belief, the Company had "significant deficiencies" relating to compliance with Anti-Money Laundering ("AML")-focused statutes, rules, and regulations, including the Bank Secrecy Act.

24.    The 2023 Annual Report contained the following statement regarding the Bank Secrecy Act:

*We face a risk of noncompliance and enforcement action with the Bank Secrecy Act and other anti-money laundering statutes and regulations.*

The federal Bank Secrecy Act, the Uniting and Strengthening America by PATRIOT Act and other laws and regulations require financial institutions, among other duties, to institute and maintain an effective anti-money laundering program and file suspicious activity and currency transaction reports as appropriate. The federal Financial Crimes Enforcement

Network, established by the U.S. Treasury Department to administer the Bank Secrecy Act, is authorized to impose significant civil money penalties for violations of those requirements and has recently engaged in coordinated enforcement efforts with the individual federal banking regulators, as well as the DOJ, Drug Enforcement Administration and IRS. There is also increased scrutiny of compliance with the rules enforced by OFAC. If our policies, procedures and systems are deemed deficient or the policies, procedures and systems of the financial institutions that we have already acquired or may acquire in the future are deficient, we would be subject to liability, including fines and regulatory actions (such as restrictions on our ability to pay dividends and the necessity to obtain regulatory approvals to proceed with certain aspects of our business plan, including our acquisition plans), which could materially and adversely affect us. Failure to maintain and implement adequate programs to combat money laundering and terrorist financing could also have serious reputational consequences for us.

25.    The statement in ¶ 24 was materially false and misleading at the time it was made because, upon information and belief, the Company had "significant deficiencies" relating to compliance with Anti-Money Laundering ("AML")-focused statutes, rules, and regulations, including the Bank Secrecy Act.

26.    The 2023 Annual Report contained the following risk disclosure regarding its blockchain-based payments platform:

> ***Acceptance and success of CBIT, our blockchain-based instant B2B payments platform, is subject to a variety of factors that are difficult to evaluate.***
>
> Customers Bank's CBIT on the TassatPay blockchain-based instant B2B payments platform serves a growing array of B2B clients who want the benefit of instant payments, including key over-the-counter desks, exchanges, liquidity providers, market makers, funds, and other B2B verticals. CBIT may only be created by, transferred to and redeemed by commercial customers of Customers Bank on the TassatPay instant B2B payments platform. CBIT is not listed or traded on any digital currency exchange. As of December 31, 2023 and 2022, Customers Bank held $2.8 billion and $2.3 billion of deposits from customers participating in CBIT, respectively. ***These customers are primarily concentrated in the digital currency industry, which has experienced significant disruptions and bankruptcies of FTX and other participants in the digital currency industry in 2022. Customers Bank has no loans to any customers in the digital currency industry. However, continued disruptions in the digital currency industry could have adverse effects on Customers' business, reputation, financial condition and results of operations***.
>
> *                *                *
>
> The financial services industry is undergoing rapid technological changes, with frequent

introductions of new technology-driven products and services including internet services, cryptocurrencies and payment systems. In addition to improving the ability to serve clients, the effective use of technology increases efficiency and enables financial institutions to reduce long-term costs. These technological advancements also have made it possible for non-financial institutions, such as "fintech companies" and market place lenders, to offer products and services that have traditionally been offered by financial institutions. Federal and state banking agencies continue to deliberate over the regulatory treatment of fintech companies, including whether the agencies are authorized to grant charters or licenses to such companies and whether it would be appropriate to do so in consideration of several regulatory and economic factors. *The increased demand for, and availability of, alternative payment systems and currencies not only increases competition for such services, but has created a more complex operating environment that, in certain cases, may require additional or different controls to manage fraud, operational, legal and compliance risks.*

New technologies, such as the blockchain and tokenized payment technologies used by CBIT, could require us to spend more to modify or adapt our products to attract and retain clients or to match products and services offered by our competitors, including fintech companies. *New technologies also expose us to additional operational, financial, and regulatory risks*. Because many of our competitors have substantially greater resources to invest in technological improvements than we do, or, at present, operate in a less-burdensome regulatory environment, these institutions could pose a significant competitive threat to us.

*As noted above, our commercial customers utilizing CBIT are currently concentrated in the digital currency industry. The digital currency industry includes a diverse set of businesses that use digital currencies for different purposes and provide services to others who use digital currencies, including the technologies underlying digital currencies, such as blockchain, and the services associated with digital currencies and blockchain*. This is a new and rapidly evolving industry, and the viability and future growth of the industry and adoption of digital currencies and the underlying technology is subject to a high degree of uncertainty, including based upon the adoption of the technology, regulation of the industry, and price volatility, among other factors. Adverse events or publicity in the digital currency industry creates reputational risk for us. Because the sector is relatively new, additional risks may emerge which are not yet known or quantifiable.

Digital currencies and tokenized payment platforms, including those utilizing proprietary, non-public tokens such as CBIT, have only recently become selectively accepted as a form of payment by business. Other factors affecting the further development and acceptance of the digital currency and tokenized payment industry, such as CBIT, include, but are not limited to:

*       *       *

- the use of digital currencies, or the perception of such use, to facilitate illegal activity such as fraud, money laundering, tax evasion and ransomware or other scams by our customers;

                                        *        *        *

If any of these factors, or other factors, slows development of the digital currency industry, it could adversely affect our instant B2B payments initiative and the businesses of the customers upon which it relies, and therefore have a material adverse effect on our business, financial condition and results of operations.

(Emphasis added).

27.    The statement in ¶ 26 was materially false and misleading at the time it was made because it understated the heightened compliance risks (in particular, compliance with AML-focused laws) as a result of the Company's digital asset business, given that, upon information and belief, the Company had existing AML compliance deficiencies.

28.    On May 9, 2024, after market hours, Customers Bancorp filed with the SEC its quarterly report on Form 10-Q for the period ending March 31, 2024 (the "1Q24 Report"). Attached to the 1Q24 Report was a certification pursuant to SOX signed by Defendant Sidhu attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

29.    The 1Q24 Report contained the following statement about the Company's internal controls:

> **Management's Evaluation of Disclosure Controls and Procedures.** As of the end of the period covered by this report, Customers Bancorp carried out an evaluation, under the supervision and with the participation of Customers Bancorp's management, including Customers Bancorp's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Customers Bancorp's disclosure controls and procedures as defined in the Exchange Act Rules 13a-15(e) and 15d-15(e). Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Customers Bancorp's disclosure controls and procedures were effective as of March 31, 2024.

30.    The statement in ¶ 29 was materially false and misleading at the time it was made because, upon information and belief, the Company had "significant deficiencies" relating to compliance with Anti-Money Laundering ("AML")-focused statutes, rules, and regulations,

including the Bank Secrecy Act.

31.    The 1Q24 Report contained the following statement regarding the Company's risk

factors:

> ***In addition to the other information set forth in this Quarterly Report, you should
> carefully consider the factors discussed in "Risk Factors" included within the 2023
> Form 10-K. There are no material changes from the risk factors included within the
> 2023 Form 10-K, except as further discussed below***. The risks described within the 2023
> Form 10-K are not the only risks facing us. Additional risks and uncertainties not currently
> known to us or that we currently believe to be immaterial also may materially adversely
> affect our business, financial condition and/or operating results. Refer to "Item 2 –
> Management's Discussion and Analysis of Financial Condition and Results of Operations
> – Cautionary Note Regarding Forward-Looking Statements."

(Emphasis added).

32.    The statement in ¶ 31 was materially false and misleading at the time it was made

because certain statements in the 2023 Annual Report were materially false and misleading for the

reasons discussed in ¶¶ 19, 21, 23, and 25.

33.    The statements contained in ¶¶ 18, 20, 22, 24, 26, 29, and 31 were materially false

and/or misleading because they misrepresented and failed to disclose the following adverse facts

pertaining to the Company's business, operations, and prospects, which were known to Defendants

or recklessly disregarded by them. Specifically, Defendants made false and/or misleading

statements and/or failed to disclose that: (1) Customers Bancorp had inadequate anti-money

laundering practices; (2) as a result, it was not in compliance with its legal obligations, which

subjected it to heightened regulatory risk; and (3) as a result, Defendants' statements about

Customers Bancorp's business, operations, and prospects were materially false and misleading

and/or lacked a reasonable basis at all times.

## THE TRUTH BEGINS TO EMERGE

34.     On April 12, 2024, after the market closed, the Company filed with the SEC a current report on Form 8-K. In this current report, the Company announced that Defendant Leibold had been fired for "cause" for violating Company policy. While the Company subsequently filed an amended current report on Form 8-K/A with the SEC on April 25, 2024, in which it announced that Ms. Leibold's termination was a "separation by mutual agreement," upon information and belief, Leibold's termination was due to the misconduct outlined in this complaint. The April 12, 2024 current report stated the following:

> Mr. Watkins replaces Carla A. Leibold, who had served as our Executive Vice President and Chief Financial Officer since November 2018. Ms. Leibold was notified of her termination from employment with the Company on April 10, 2024, for "cause" under her employment agreement for violating Company policy, which termination was effective immediately. Ms. Leibold has disputed the Company's characterization of her separation from the Company.

35.     On this news, the price of Customers Bancorp stock fell $2.40 per share, or 4.89%, to close at $46.62 on April 15, 2024.

36.     On August 8, 2024, during market hours, the Federal Reserve issued a press release entitled "Federal Reserve Board issues enforcement action with Customers Bancorp, Inc. and Customers Bank." Attached to this announcement was a written agreement between the Company and the Federal Reserve Bank of Philadelphia (the "Agreement"). The Agreement stated the following:

> WHEREAS, [Customers Bancorp] has pursued a business strategy that involves offering banking services **to digital asset customers ("digital asset strategy"), and also operates an instant payments platform that allows commercial clients to make tokenized payments over a distributed ledger technology system to other commercial clients of [Customers Bank];**
>
> WHEREAS, the most recent examinations and inspection of the Organization conducted by the Federal Reserve Bank of Philadelphia ("Reserve Bank") **identified significant deficiencies related to the Bank's risk management practices and compliance with the applicable laws, rules, and regulations relating to anti-money laundering ("AML"), including the Bank Secrecy Act (the "BSA")** (31 U.S.C. § 5311 et seq.), including the

rules and regulations issued thereunder by the U.S. Department of the Treasury (31 C.F.R. Chapter X), and the AML requirements of Regulation H of the Board of Governors (12 C.F.R. §§ 208.62 and 208.63) (collectively, the "BSA/AML Requirements"); and the regulations issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") (31 C.F.R. Chapter V) (the "OFAC Regulations")[.]

(Emphasis added).

37.    The Agreement provided the following regarding strengthened board oversight of the Company's AML compliance, with a focus on the Company's digital asset business. It stated, in pertinent part, the following:

Within 60 days of the effective date of this Agreement, the board of directors of the Bank shall submit a written plan to the Reserve Bank to strengthen board oversight of the management and operations *of the Bank's compliance with the BSA/AML Requirements and OFAC Regulations*. The plan shall include the following six items:

(a) actions that the Bank's board of directors will take to improve the Bank's condition and maintain effective control over, and supervision of, the Bank's major operations and activities, *including its digital asset strategy*;

(Emphasis added).

38.    The Agreement further stated that the Company, within 60 days of the effective date of the Agreement, would be required to submit a plan to the government regarding its plan to improve risk management relating, in part, to the Company's digital asset strategy. The Agreement specifically stated the following:

Within 60 days of the shall submit a written plan to acceptable [SIC] to the Reserve Bank to improve risk management practices with respect to the Organization's digital asset strategy. The plan shall require the following six items:

(a)    enhanced written policies, procedures, and risk management standards, including regular training thereon, to identify, assess, manage, *and monitor risk exposures, and facilitate compliance with applicable laws and regulations*;

(b)    measures to ensure that the individuals or groups charged with the responsibility for the Organization's *digital asset strategy possess the appropriate subject matter expertise, stature, independence, and authority; have clearly defined roles and responsibilities; and are allocated adequate resources and staffing*;

(c)    ***steps to enable timely identification, measurement, assessment, and reporting of risk exposures associated with the digital asset strategy,*** including for existing and proposed partner, products, programs, services, business lines, or customers, and a common risk assessment and rating methodology that is regularly updated to account for changes in relevant risk factors;

(d)    the establishment of appropriate compensating controls to mitigate risks;

(e)    the provision of sufficient information, data, and reports to senior management and the board of directors that enable proper identification and oversight of existing and developing risks; and

(f)    steps to ensure that the Bank has adequate controls in place to conduct its ***dollar token activities in a safe and sound manner***.

(Emphasis added).

39.    On this news, Customers Bancorp's stock fell $8.38 per share, or 15.1% (as compared to the opening price on August 8, 2024), to close at $47.01 on August 8, 2024.

40.    On August 8, 2024, after the market closed, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended June 30, 2024 (the "2Q24 Report"). The 2Q24 Report stated the following, disclosing a consent order by the Commonwealth of Pennsylvania, Department of Banking and Securities, Bureau of Bank Supervision (the "Consent Order"):

On August 5, 2024, Customers (i) entered into a written agreement with the FRB ("Written Agreement") and (ii) agreed to the issuance of a consent order by the Commonwealth of Pennsylvania, Department of Banking and Securities, Bureau of Bank Supervision ("Consent Order"). The Written Agreement and Consent Order relate principally to aspects of compliance risk management, including risk management practices governing digital asset-related services; oversight by the Board of Directors of Customers Bancorp and the Bank; compliance with anti-money laundering regulations under the Bank Secrecy Act; and compliance with the regulations of the Office of Foreign Assets Control. The Board of Directors and management of Customers Bancorp and the Bank have already begun to take steps to address the issues identified in the Written Agreement and Consent Order and are committed to ensuring that all of the requirements of the Written Agreement and Consent Order are met.

41.     The Consent Order was attached to the 2Q24 Report, and outlined substantially similar deficiencies as those addressed in ¶ 36. The Consent Order then stated that "***these deficiencies give the Bureau reason to believe that the Bank had engaged in unsafe or unsound banking practices relating to BSA/AML Requirements***[.]" (Emphasis added).

42.     On this news, the price of Customers Bancorp stock fell a further $1.08, or 2.29%, to close at $45.93 on August 9, 2024.

43.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Customers Bancorp securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

45.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

46.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

16

49.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

50.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

51.    Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such

information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

52.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

<u>**COUNT I**</u>
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
<u>**Against All Defendants**</u>

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

55.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

57.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

58.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

59.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing

the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

60.      Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

61.       As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

62.      By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

### COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

63.      Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.      During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices.

65.      As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition

and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

66.      Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

67.      By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)      declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)      awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)      awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: December 2, 2024

**THE ROSEN LAW FIRM, P.A.**

*/s/ Ian J. McDowell*
Ian J. McDowell, Esq.
Jacob A. Goldberg, Esq.
Olivia D. Simkins, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: imcdowell@rosenlegal.com
jgoldberg@rosenlegal.com
osimkins@rosenlegal.com

Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*